UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

KEITH KARLSON, an individual,

                  Plaintiff,

v.

PAUL SCHOLES, an individual, and
IAMS HOMES, a business entity,

                  Defendants.

Case No. 4:13-cv-00133-EJL-CWD

**MEMORANDUM DECISION AND
ORDER**

## INTRODUCTION

Plaintiff Keith Karlson, an artist, prepares drawings, or renderings, of residential

homes from blueprint plans to illustrate how a home will look once built. Karlson created

his renderings for use by Red Door Homes, LLC. Defendant Paul Scholes, a residential

contractor, acquired the renderings from a previous employer, Red Door Homes of Snake

River Valley, LLC, before reproducing Karlson's renderings on his website,

Iamshomes.com. Karlson filed this lawsuit on March 19, 2013, claiming thirty-five

counts of copyright infringement on the grounds Scholes did not have permission to

reproduce Karlson's copyrighted renderings.

Plaintiff filed a motion for summary judgment on October 4, 2013, and the Court conducted a hearing on March 11, 2014. After carefully considering the parties' arguments, the relevant authorities, and the record before the Court, the Court finds there are disputed issues of material fact that preclude summary judgment. The Court's analysis follows.

## FACTS[1]

Beginning in March of 2008, Karlson created and sold original renderings to Red Door Homes, LLC, a Florida company, which licenses packages of assets and services that include home designs to home builders. The principal of Red Door Homes was Patrick Miller. Karlson invoiced Red Door Homes for his artistic renderings, and included a copyright notice on each invoice. The copyright notice stated,[2] in relevant part:

> With delivery of your artwork, I transfer to you a limited copyright to reproduce the artwork I have produced for you in unlimited quantities on any media you choose, royalty-free, but only for use directly by you and may not be transferred to another business entity without my expressed permission. . . . By using the artwork in any way, you hereby agree to these terms and limitations to the copyrights transferred to you with delivery of your artwork.

---

[1] The Court finds the following facts material and admissible in evidence for purposes of disposing of Plaintiff's motion for summary judgment. If certain facts or documents are not mentioned herein, the Court found them either to be irrelevant; immaterial; inadmissible hearsay under Fed. R. Evid. 801 and 802; or otherwise presented in a form that would not be admissible in evidence. *See* Fed. R. Civ. P. 56(c). Further, the Court notes the use of "text boxes" on several of Karlson's .pdf images submitted to the Court. The Court cannot consider the statements, explanations, and argument set forth in the text boxes by counsel. Fed. R. Civ. P. 56(c). A witness must authenticate and describe the documents, and explain what the documents demonstrate.

[2] Karlson's affidavit, ¶¶ 15-17, (Dkt. 20-3), references the copyright notice, and refers to EX. B-1 – B-6, which are attached to the Second Amended Complaint. (Dkt. 12.)

Karlson contends he did not grant Red Door Homes the right to transfer the copyright or usage rights in his original artwork to other business entities without Karlson's permission and payment for the distribution.

Scholes was previously employed by Red Door Homes of Snake River Valley, LLC ("Snake River"). Scholes was provided with a compact disc containing Karlson's renderings on it at a Red Door Homes meeting in Florida. Scholes believed that a licensing agreement existed between Red Door Homes and Snake River, which permitted him to use Karlson's renderings. A licensing agreement, dated June 15, 2009, between Red Door Homes and Snake River, purported to grant Snake River a license to carry on a business using the Red Door Homes business system and intellectual property relating to the business system in certain Idaho counties. Karlson Aff. Ex. Y.[3] Scholes used Karlson's renderings to create web page content advertising Snake River's services. Karlson did not become aware that Red Door Homes had distributed Karlson's renderings to Red Door Homes' licensees until November of 2009.

In December of 2009, Karlson applied for copyright registration and received a certificate of registration on December 18, 2009, in his original artwork. Am. Compl. Ex. A. The copyright registration certificate identifies the copyrighted work as "Red Door Homes Art." *Id.* The renderings comprising "Red Door Homes Art," are not specifed in the registration certificate, and the application submitted for the registration is not in the record.

---

[3] The Court considered Exhibit Y because, with the proper authentication, it would be admissible in evidence at trial.

The complaint lists, in counts one through thirty five, the titles given the renderings, and in paragraph eleven, asserts that "these artworks make up a collection of material known as the Red Door Homes Art, and the artworks that are the focus of this action." Scholes in his answer denies the factual assertion in paragraph eleven based upon lack of information. Ans. (Dkt. 16.) In his affidavit, Karlson identifies thirty-five renderings as his original work, but does not explicitly state that these thirty-five renderings are the renderings covered by the copyright registration and identified as "Red Door Homes Art." Aff. of Karlson ¶ 4, Ex. W-01-W35 (Dkt. 20-3.)

In any event, shortly after obtaining the registration, Karlson ordered Red Door Homes to discontinue using his artwork, and to inform Red Door licensees to discontinue their use of his artwork. Karlson received a list from Red Door Homes of Red Door clients that had used Karlson's artworks, which list did not include Scholes or Iams Homes. Red Door Homes reported to Karlson that it was not using any of Karlson's renderings "at the corporate or division level." Karlson therefore understood that Red Door Homes and its licensees had stopped using Karlson's artwork as of January 2010.

Meanwhile, Snake River ceased operations in or about November of 2009 due to a lack of revenue, and dissolved on September 7, 2010. Scholes then began his own company, Iams Homes, sometime in 2010,[4] and he created a website advertising Iams

---

[4] Karlson includes numerous documents, including screen shots and archived files of the Iams Homes website, to document when Scholes purportedly began his business and when Scholes created the Iams Homes website. Absent authentication, and testimony about the process used to extract the archived files and how Karlson obtained the information, the Court cannot consider the evidence upon summary judgment. Moreover, the evidence would not necessarily be conclusive as to when Iams Homes opened its door to the public. Many steps might precede a business opening, including applications for a business
(Continued)

Homes construction services sometime after August 11, 2010.[5] Scholes later utilized

several of Karlson's original renderings on the Iams Homes website. Scholes claims he

received permission from Patrick Miller of Red Door Homes to continue to use the

Karlson renderings on the Iams Homes website. According to Scholes, he and Miller

agreed that, "instead of paying an upfront licensing fee, which was the customary

practice of Red Door Homes, [Scholes] would pay a per use licensing fee for each

construction contract [he] sold." Scholes contends he had "no knowledge that [Karlson]

had demanded Red Door Homes, LLC, or any of its affiliates, cease the use of" Karlson's

renderings. Aff. Of Scholes ¶ 6 (Dkt. 21-1.)

Karlson found thirty of his renderings on the Iams Homes website on or about

October of 2010, and on January 3, 2011, sent correspondence demanding that Scholes

cease using the renderings on the website.[6] Scholes claims that on March 4, 2011, he had

taken action to eliminate Karlson's artwork from Iams Homes offerings and had

restricted all public access to the Iams Homes website. Karlson contends that the Iams

Homes website continued to display his artwork throughout 2011, offering "webarchive"

---

license or registration of a website URL. The Court discusses the evidentiary issues in further detail later in this opinion.

[5] Scholes admits that the URL domain name "iamshomes.com" was registered on August 11, 2010. By implication, the website was therefore created sometime later.

[6] Scholes asserts in his affidavit that once Karlson informed him of the copyright in the renderings, Scholes talked to Miller, and "Miller informed me that [Karlson] had been hired by Red Door and had been paid by Red Door, and that Red Door had the authority to allow me to use the images on my website." Aff. of Scholes ¶ 11 (Dkt. 21-1.) Scholes is testifying about an out of court statement by Miller, and asserting that it is true. The statement is hearsay, and cannot be considered by the Court upon summary judgment. Fed. R. Evid. 801.

files to illustrate what he observed on the Iams Homes website after March 4, 2011. Aff. of Karlson Ex. JJ (Dkt. 20-3.)

In October of 2011, Scholes hired Kevin Whipple, an intern from BYU-Idaho, who was given access to the Iams Homes website. Scholes states that Whipple added five previously unused Karlson renderings to the website "claimed to be copyrighted by [Karlson]," and that Whipple inadvertently opened access of the website to the public. Aff. of Scholes ¶ 16 (Dkt. 21-1.) These five images are identified in counts thirty one through thirty five of the Second Amended Complaint as the "Clarion A," "GeorgetownA," "PhillipsburgA," "fpGeorgetown," and "fpPhillipsburg." As soon as Scholes became aware that the website could be accessed by the public, Scholes claims to have shut down public access. Scholes asserts that he never wilfully or intentionally published materials copyrighted by Karlson "without the belief that [he] was justified in doing so pursuant to [his] agreement with Patrick Miller and Red Door Homes."

Two other sets of facts bear mention. First are Scholes's carefully chosen admissions. Scholes does not deny that Karlson holds a Certificate of Registration in his original art, but denies that the artworks that are the subject of the complaint make up the collection the registration identifies as "Red Door Homes Art." Second Am. Compl. ¶ 11, 12; Ans. ¶ 11, 12. And, in his brief, Scholes again admits that Karlson owns a valid copyright, but does not indicate in what. Response at 2 (Dkt. 21.) Further, Scholes's written agreement to indemnify Whipple states that he "agrees to indemnify Kevin Whipple's actions listed in the complaint … namely actions taken by Mr. Whipple which include the placing of pictures on Mr. Scholes, website, [sic] which have been *alleged* by

Keith Karlson to have been protected by a copyright." Aff. of Karlson Ex. BB (Dkt. 20-3.) (emphasis added).

Second is the Alabama lawsuit involving Red Door Homes. Karlson brought a copyright infringement suit against Red Door Homes and other defendants in the United States District Court for the Northern District of Alabama, claiming Red Door Homes owed him $142,279 for its use of his artwork as provided to others. *See Karlson v. Red Door Homes, LLC, et. al.,*[7] No. CV-11-J-1511-NE, 2012 WL 1747845 (N.D. Ala. May 16, 2012). Defendants in the Alabama action moved for summary judgment, and Karlson filed a cross-motion for summary judgment. *Id.*

The Alabama District Court rejected Karlson's argument that the invoices submitted to Red Door Homes protected his work, explaining that the invoices:

> cannot be part of the contract between the parties to produce the work because they were sent after the renderings were provided to the defendants. . . Although the invoices contained language to the effect that by using his artwork, the defendants agreed to the terms listed in the invoices, the work was completed and sent to defendants prior to their receipt of an invoice. Thus, any statement regarding use of the renderings in the invoices could not form the basis of an agreement between the parties concerning plaintiff's production of those renderings. . . .

*Karlson*, 2012 WL 1747845 at *4 (internal citations omitted). Further, the court explained that Karlson's sole outlet for the renderings was the defendants, because the renderings, in and of themselves, had no value and no market apart from the sale to the defendants. *Id.*

---

[7] The other named defendants, SMA Operations Management, LLC and RDH Advising, LLC, were licensors of Karlson's work. SMA hired Patrick Miller in 2008, and Miller also became a shareholder in Red Door Homes.

Having so concluded, the Alabama District Court held that the relationship between Karlson and Red Door Homes "is one of a nonexclusive license from plaintiff to defendant," and found that Karlson had granted the defendants a "permissive, non-exclusive license to use and reproduce [Karlson's] renderings." *Id.* at *5. The court based its conclusion upon the circumstances and the relationship between the parties---because Karlson created the works at Red Door Homes' request and handed them over, the intent must have been for Red Door Homes to be able to copy and distribute the work. *Id.* Therefore, the court found no infringement occurred because the defendants' use of Karlson's renderings was based upon an implied nonexclusive license. *Id.* at *6.

The Alabama District Court considered also Karlson's breach of contract claim. Karlson asserted he had "a binding agreement" with the defendants concerning the use of his renderings. But the court found that the only writings submitted to the court regarding any agreement between Karlson and the defendants demonstrated that, once Karlson questioned what the parties' agreement was, they were unable to come to any agreement regarding the use of Karlson's renderings, and the parties ceased their business relationship. *Id.* at *7.

As part of its ruling, the court found that Karlson was entitled to judgment in his favor on the issue of the validity of his copyright, and that defendants were entitled to judgment in their favor on the issue of copyright infringement and on Karlson's breach of contract claim. The court found Karlson's unjust enrichment claim to be without merit. *Id.* at *7.

Karlson appealed the judgment to the United State Court of Appeals for the Eleventh Circuit. The appellate court concluded that the district court erroneously granted summary judgment on a ground raised *sua sponte*, and upon a ground the defendants had not argued, without adequate notice to the defendants. *Karlson v. Red Door Homes, LLC*, 2014  WL 228697 (11th Cir. Jan. 22, 2014). The appellate court found that the failure to give the parties notice and a reasonable time to respond before granting the motion on grounds not raised by either party contravened Fed. R. Civ. P. 56(f). *Id.* at *1. Because the district court failed to provide notice to the parties that it intended to address the implied-license question, the appellate court on January 22, 2014, vacated the district court's grant of summary judgment and remanded the case for further proceedings. *Id.* at *2.[8]

In the matter before this Court, Karlson alleges thirty-five separate counts of copyright infringement against Scholes and Iams Homes. Karlson seeks summary judgment on the issue of infringement, and requests an award of statutory damages for each count of infringement plus the statutory enhancement for willful infringement. In addition, Karlson asks for an injunction and an award of attorney fees under the Copyright Act. Scholes argues that summary judgment against Defendants on Karlson's copyright infringement claim is improper, because genuine issues of material fact exists

---

[8] Karlson noted the district court proceeding was on appeal, but failed to provide the Court notice that the district court opinion had been reversed and remanded. Nor did Karlson and Scholes consider the implications of the reversal upon this Court's determination.

as to whether Scholes was given permission by Patrick Miller as a sub-licensee to use the renderings, and whether the alleged infringements were willful.

## DISPOSITION

### 1.   Summary Judgment Standards

A principal purpose of summary judgment is to "isolate and dispose of factually unsupported claims ...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the nonmoving party to produce evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 256–57. The "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *S. Cal.*

*Gas Co.*, 336 F.3d at 889. In other words, the nonmoving party must go beyond the pleadings and show "by [its] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 324. The Court must draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and the weight to be accorded particular evidence, and must view the facts in the light most favorable to the nonmoving party. *Kaelin v. Globe Communications Corp.*, 162 F.3d 1036, 1039 (9th Cir. 1998).

The party bearing the burden of proof at trial "must establish beyond controversy every essential element of its ... claim." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003) (adopting decision of district court "as our own"). A party who does not have the burden "may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact." Fed. R. Civ. P. 56(c)(1)(B) (advisory committee's note.)

## 2.     Copyright Infringement

A plaintiff bringing a claim for copyright infringement must demonstrate "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Copyright protection subsists in "original works," and is created "every time people set pen to paper." *Aerocon Eng., Inc. v. Silicon Valley Bank* (*In re World Auxiliary Power Co.*), 303 F.3d 1120, 1131 (9th Cir. 2002). Congress granted copyright protection to architectural works and architectural drawings under 17 U.S.C. §§ 102(a)(8) and 102(a)(5), respectively.

Although most copyrights are unregistered, registration of a copyright bestows additional protections. First, a copyright registration certificate constitutes prima facie evidence of validity of a copyright, and the burden then shifts to the party challenging the copyright to dispute its validity. *Autoskill, Inc. v. Nat'l Educational Support Sys., Inc.*, 994 F.2d 1476, 1487 (10th Cir. 1993). Second, registration bears greatly on recoverable damages. Neither statutory damages nor attorney fees are recoverable for infringements of copyright commenced after first publication of the work but before the effective date of its registration, unless registration is made within three months after the first publication of the work. 17 U.S.C. § 412. Therefore, a prerequisite to recovery of statutory damages is a certificate of registration in the work. 17 U.S.C. § 412. A copyright owner claiming statutory damages need not prove actual damages. 17 U.S.C. § 504(c). Instead, statutory damages are recoverable "in a sum of not less than $750 or more than $30,000" for each infringement. 17 U.S.C. § 504(c)(1).

Enhancement of statutory damages is proper if the infringement was "willful." The provision governing willful infringement states:

> In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000. In a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200.

17 U.S.C. § 504(c)(2).

Neither the Copyright Act nor its legislative history defines "willful." However, "[i]t seems clear that as here used 'willfully' means with knowledge that the defendant's conduct constitutes copyright infringement." *Peer Intern. Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1336 n.3 (9th Cir. 1990) (quoting 3 M. Nimmer & D. Nimmer, NIMMER ON COPYRIGHT § 1404[B], at 14–40.2–.3 (1989)). If there is evidence of willful infringement, the infringer "must not only establish its good faith belief in the innocence of its conduct, it must also show that it was reasonable in holding such a belief." *Id.* at 1336 (citing 3 M. Nimmer & D. Nimmer, NIMMER ON COPYRIGHT § 14.04[B], at 14–40.3 (1989)). A defendant who ignores the revocation of a license to a copyrighted work and continues to use the work after the revocation, willfully infringes that work. *Peer Intern. Corp.*, 909 F.2d at 1335-36 n.3 (9th Cir. 1990). Importantly, to obtain statutory damages and enhancement of the same, the copyright owner must first prove copying of the works, and next establish the copied works are registered.

A copyright owner has the exclusive rights to copy, distribute or display the copyrighted work publically. 17 U.S.C. § 106. And, a copyright owner can sell or license[9] his rights to someone else, but a transfer of ownership, including an exclusive license, in the work is invalid unless it is in writing. 17 U.S.C. § 204(a).[10] Nonexclusive licenses, however, do not need to be in writing, and may be granted orally, or implied

---

[9] A licensee does not infringe the owner's copyright unless the licensee's use exceeds the scope of its license. *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1087 (9th Cir. 1989).

[10] A transfer of copyright ownership is defined as an "assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright ... but not including a nonexclusive license." 17 U.S.C. § 101.

from conduct. *Effects Assoc., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990) (citing 3 M. Nimmer & D. Nimmer, NIMMER ON COPYRIGHT § 10.03[A], at 10–36 (1989)). If an artist creates a work at the defendant's request and hands it over, intending that the defendant copy and distribute it, and the work would have "minimal value" without the right to copy and distribute, the court may find that the artist impliedly granted a nonexclusive license to the defendant. *Effects Assoc., Inc.*, 908 F.2d at 558-59.

Here, there is no dispute that Karlson obtained a Certificate of Registration of copyright on December 18, 2009, and that Karlson owns a valid copyright in his original works. Nor does Scholes dispute that he reproduced Karlson's renderings on the Iams Homes website during certain time periods. Scholes, however, claims he was granted a sublicense by Patrick Miller of Red Door Homes to use Karlson's renderings. But neither party appreciates that March 4, 2011, marks a point of divergence. Scholes does not deny Karlson informed him to stop using the images, and Scholes states he removed the images from the website on March 4, 2011. Thus, any use after March 4 would be in disregard of Karlson's express demand to stop using the images. Accordingly, the Court will address the issues in that fashion—use of the works before March 4, and use after March 4.

### A.    *Use Before March 4, 2011*

Prior to March 4, 2011, Scholes believed that Red Door Homes and its principal, Patrick Miller, had the authority to allow Scholes to use the Karlson images via a sublicense. Karlson wastes an inordinate amount of ink explaining to the Court the inferences to be drawn from the evidence, arguing that based upon these inferences, no

reasonable juror could believe Scholes. But the Court must draw all reasonable inferences in favor of the nonmoving party, Scholes.

For example, Karlson notes that Scholes did not specify the date when Miller gave permission to use the images. Then, Karlson argues that because Iams Homes was not formed until September of 2010, well after Miller affirmed in January of 2010 that Red Door Homes and its affiliates ceased using the images, the facts support an inference that Miller could not have given permission to Scholes until after Red Door Homes was on notice that it could not give anyone permission to use Karlson's images. But an equally supportable inference is that Miller may have turned his nose up at Karlson, lied to Scholes, and gave Scholes what Scholes understood was permission to use the images.

Further, Karlson fails to appreciate that Scholes was given the disc with the images while he worked for Snake River, and that Scholes contends he understood Snake River was permitted to use the images. Scholes, perhaps strategically, does not tell the Court when Miller gave him permission to further use the images for Iams Homes, and only stated that "I received permission from Patrick Miller to continue to use the subject

materials on iamshomes.com."[11] The undisputed facts show that, although Snake River

did not formally dissolve until September of 2010, Snake River shut down long before

that—in November of 2009, before Karlson had contacted Red Door Homes. Thus, even

though the Iams Homes website was not created until after the domain name was

registered in September of 2010, the conversation Scholes had with Miller (and the

concept of iamshomes.com) could have occurred <u>long before</u> the website was created.

Because of the facts, a reasonable inference can be drawn that the initial conversation

between Scholes and Miller occurred when Snake River shut down in 2009, and Scholes

was out of work. Perhaps Scholes created the concept of Iams Homes then, but did not

implement his business plan until much later.

      Karlson makes much ado over the conspicuous absence of Iams Homes from the

list Red Door Homes provided Karlson of Red Door affiliates using Karlson's images. He

argues that this omission supports the inference that Miller never granted a sublicense to

Scholes, because if Miller had done so, Iams Homes would have been included on the

list. But the lawsuit between Karlson and Red Door Homes involves Red Door and its

---

[11] At the hearing, Karlson argued that, even if Miller had granted Scholes an oral sublicense, Scholes did not inquire about the validity of the sublicense until Karlson contacted Scholes in January/February of 2011. The problem here is that Karlson wants this Court to draw an inference from the inadmissible hearsay in Scholes's affidavit, in which Scholes stated that after Karlson contacted Scholes in January 2011, Scholes in turn contacted Miller, asked about the license, and was told by Miller that Red Door had the authority to allow Scholes to use the images on Scholes website. Karlson argues this statement supports his theory that Scholes never inquired about or was granted the sublicense, because he failed to ask about it until February of 2011. However, not only is the statement hearsay, but if the statement is eventually admitted in evidence, the inference is not supported based upon the evidence before the Court. Scholes never states in his affidavit, nor is there other information in the record, indicating when Scholes was *initially* granted the sublicense. The statement, if admissible, supports the inference that Scholes called Miller in February of 2011 to inquire whether Red Door had a license at some point in time.

affiliates, not Scholes. The record before the Court does not indicate Iams Homes was an affiliate or client of Red Door Homes. Thus, the absence of Iams Homes on Red Door Homes's list of "clients" to whom it distributed Karlson's images is meaningless. If Iams Homes was not a "client" or an "affiliate," then Miller, as part of the discovery in *Karlson v. Red Door*, or at any time prior, did not necessarily need to disclose that he had given permission to Scholes to use the images. Or maybe Miller forgot the conversation he had with Scholes, which would alternately explain why Miller failed to disclose Iams Homes on the list. Consequently, Karlson's argument is unpersuasive.

Conspicuously absent is Miller's affidavit, or any deposition testimony, regarding what Miller told Scholes and when, and why Miller failed to identify Scholes and Iams Homes as an entity to whom it had given permission to use the images. Karlson points out that Scholes did not supply Miller's affidavit to corroborate Scholes's testimony. But it was not Scholes' obligation, as the nonmoving party, to do so.[12] As the moving party, Karlson could have deposed or produced an affidavit from Miller. Karlson chose not to. He therefore has nothing to refute the competing inferences supporting Scholes's argument. Further, Scholes's statement that he believed Miller, on behalf of Red Door, had the authority to grant Scholes permission to use the images and that Miller did so remains unrefuted.[13]

---

[12] Karlson, by virtue of the pleadings and discovery, knew what Scholes's defense was.

[13] Whether Scholes is believable would be a credibility determination for the jury.

Finally, neither party appreciates the implication of the Alabama District Court's findings. The district court found that Karlson granted Red Door an implied nonexclusive license to distribute, and therefore sublicense, the use of Karlson's artistic images. Although the Eleventh Circuit vacated the district court's judgment, upon remand the district court could make the same determination.[14] If the court again determines Karlson granted Red Door an implied nonexclusive license, issue preclusion may apply. For instance, if Red Door did have an implied nonexclusive license to distribute Karlson's work, then that fact may prevent Karlson from asserting in this matter that Red Door (and Miller, its principal) lacked authority to grant Scholes a sublicense to use the works. However, that legal issue is not before the Court. And, although a copy of the 2009 license agreement and the invoices Karlson sent to Red Door are in the record, this Court was not asked to determine the validity of the license between Karlson and Red Door. That issue will be left to the Alabama District Court to decide.

Scholes, as the nonmoving party, is entitled upon summary judgment to have all inferences construed in his favor. Based upon the record before this Court, there are disputed issues of material fact, and unresolved legal issues in *Karlson v. Red Door Homes, LLC*, that may impact the Court's decision in this case. If Red Door possessed an implied nonexclusive license to distribute Karlson's work, and Scholes proves he was granted a sublicense, there can be no infringement prior to March 4, 2011. Summary

---

[14] Neither party submitted a notice of supplemental authority informing the Court of the Eleventh Circuit's reversal and remand. The Court asked the parties at the hearing to comment on the implications of the Eleventh Circuit's decision, and to submit a notice of supplemental authority if the Alabama District Court issues an opinion before trial commences in this case.

judgment on the issue of copyright infringement for the period before March 4, 2011, will therefore be denied.[15]

## B. *Use After March 4, 2011*

Karlson argues that Scholes's continued display of Karlson's work on the Iams Homes website after March 4, 2011, constitutes "willful infringement." Am. Compl. Ex. O.[16] Scholes admits Karlson demanded he discontinue using the images on the Iams Homes website, and that Scholes did so in March of 2011. Accordingly, copying of Karlson's works after March 4, 2011, would be without permission. There is no dispute Scholes understood he could no longer use Karlson's images after Karlson demanded the images be removed from the Iams Homes website.[17]

---

[15] Although Karlson did not argue "willful" infringement occurred prior to March 4, 2011, the Court notes that Scholes good faith belief that he was granted permission to use the images by Patrick Miller of Red Door Homes, and the reasonableness of that belief, may preclude a finding of willfulness.

[16] The Court reaches this issue because, if Karlson cannot prove infringement prior to March 4, 2011 (based presumably on the validity of the license and later sublicense), Karlson's claims would be limited to the infringement that occurred after March 4, 2011, after he informed Scholes to stop using the images.

[17] Karlson limits his "willfulness" argument to Scholes' alleged copying after March 4, 2011. If there had been a sublicense, it could be inferred that whatever prior permission Scholes had, it was now revoked. A defendant who ignores the revocation of a license to a copyrighted work and continues to use the work after the revocation, willfully infringes that work. *Peer Intern. Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1336 n.3 (9th Cir. 1990) (quoting 3 M. Nimmer & D. Nimmer, NIMMER ON COPYRIGHT § 1404[B], at 14–40.2–.3 (1989)). The Court makes the assumption of revocation only for purposes of the motion. Although the Court cannot decide upon summary judgment whether Miller granted Scholes a sublicense based upon the purported Karlson/Red Door agreement, the Court continues its analysis because the only reasonable inference from the facts in the record is that Scholes understood he could no longer use the images. Whether that is because Scholes believed the sublicense was revoked is not established on this record. But, the Court notes the inherent inconsistency in Karlson's argument. By limiting his "willfulness" argument to the copying that occurred after March 4, 2011, Karlson impliedly validates the sublicense granted to Scholes under the holding in *Peer Intern. Corp.*

Karlson contends he viewed the images on the Iams Homes website at various times after March 4, 2011, while Scholes contends he removed the images. Thus, there is a material factual dispute here, but not with respect to the issue of "willfulness." At its core, the dispute concerns copying, and entitlement to statutory damages, both findings which must precede enhancement of statutory damages for "willful" infringement.

There are two reasons preventing summary judgment on the issue of infringement, and entitlement to statutory damages, after March 4, 2011. First, Karlson does not carry his burden of proof to show that Scholes continued to display the images on the Iams Homes website. In other words, Karlson does not conclusively prove copying.

Karlson provided the Court with "archived images" of the Iams Homes website on a disc to prove that Scholes continued to display Karlson's images publicly. Karlson represents that he saved the archives in "Apple Safari Browser's .webarchive" format, and that the archives "are true copies of iamshomes.com webpages as they appeared on the iamshomes.com webserver at the time they were archived immediately after a fresh uncached download from the iamshomes.com webserver. These files and their true archived dates are show in in Ex. JJ listed as they appear on the computer I used to archive them."

Lacking from the record is testimony concerning what an "archived" image of the Iams Homes website represents, whether Karlson is qualified to testify about how one "archives" a webpage, and whether that archived image is what the public would see. The Court is not an expert in what an archived file is, nor does the Court know what "Apple Safari Brower's '.webarchive' format" is, how it works, or why Karlson is qualified to

testify on the subject. *See* Fed. R. Evid. 702. There was no actual testimony on the subject of webpage archiving presented to the Court. Perhaps Karlson saw an old image of the Iams Homes website and archived that page.

Karlson asks the Court to consider Exhibit JJ as conclusive proof Scholes continued to display Karlson's renderings after March 4, 2011. Yet the Court lacks any specific description about webpages, webservers, and websites that would help the Court understand what a webarchive is and why the images on Exhibit JJ conclusively prove that Scholes continued to display Karlson's renderings on the Iams Homes website after March 4, 2011.

The Court does have, however, Scholes's testimony that he removed Karlson's images from the website and restricted public access to the website. When he discovered that his unwitting intern posted five new images and removed the password protection from the website, Scholes again took action as soon as he discovered the situation.[18] Perhaps Scholes did not achieve what he thought he did. Perhaps he is not telling the Court the truth. Scholes does not explain the process he used to remove the images from the website. These issues involve additional testimony and a determination of credibility, something the Court cannot do upon summary judgment.

---

[18] At the hearing, there was discussion regarding the restricted access to the website. Copying, whether displayed to the public or downloaded for one's own personal use on a password protected website, is still copying. Counsel for Scholes represented that Scholes used the images in a class he taught, and his students were given passwords to the website. This fact is not in the record. However, it may raise the issue of "fair use," which does not constitute an infringement of copyright. *See* 17 U.S.C. § 107 (defining fair use as use by reproduction for purposes such as "criticism, comment, news reporting teaching (including multiple copies for classroom use), scholarship, or research").

Second, even assuming infringement, Karlson does not connect the dots and conclusively prove entitlement to statutory damages after March 4, 2011. Important here is Karlson's reliance upon his Copyright Registration, which in turn supports Karlson's claim to statutory damages without proof of actual damages. A copyright owner must be entitled to statutory damages before he can enhance those damages by a showing of willfulness. Therefore, Karlson cannot obtain enhancement of his statutory damages for "willful" infringement unless he first carries his burden establishing that the works copied are covered by the registration.

Karlson does not supply this Court with the linear evidence it needs to determine, as a matter of law, that "Red Door Homes Art" comprises the thirty-five works that Scholes in turn allegedly copied on the Iams Homes website. Karlson avers in his complaint that thirty-five named works are covered by the Certificate of Registration. The certificate, however, identifies the registered works as "Red Door Homes Art." The operative complaint does not attach the application for registration of copyright or the drawings to illustrate the renderings comprising "Red Door Homes Art."

Importantly, Scholes denies in his Answer that the registration covers the works at issue and named in the complaint. Although Scholes does not deny Karlson has a valid copyright,[19] Scholes denies that the thirty-five works named in the complaint are covered by the Registration, which is significant. Karlson has not sufficiently linked the alleged copying of the thirty-five images to the works identified as "Red Door Homes Art" in the

---

[19] Copyright protection in original works exists independent of registration.

registration. Because Scholes denies the registration protecting "Red Door Homes Art"

encompasses the thirty-five works named in the complaint, Karlson has failed to prove,

as a matter of law, that his registration for "Red Door Homes Art" entitles him to

statutory damages.

Nor does Karlson's affidavit supply the missing dots. His affidavit attaches thirty

five illustrations, but nowhere does he explicitly state that these thirty-five works are the

renderings the Certificate refers to as "Red Door Homes Art." Throughout the record,

both in Scholes's affidavit, in his response brief, and in the indemnification agreement,

Scholes consistently denies that the works named in the complaint make up the collection

the registration identifies as "Red Door Homes Art." Scholes carefully crafted the

indemnification agreement to include the phrase, "alleged . . . to have been protected by

copyright," and his affidavit states that Whipple added five previously unused Karlson

renderings to the website "claimed to be copyrighted by [Karlson]." These qualifications

essentially deny that Karlson's registration certificate encompass the renderings in

Scholes's possession, and create a material issue of disputed fact regarding Karlson's

entitlement to statutory damages. Thus, the Court cannot reach the question of

willfulness.

## CONCLUSION

Plaintiff's Motion for Summary Judgment will be denied. After drawing all reasonable inferences in favor of Scholes, the nonmoving party, there are disputed issues of material fact regarding whether Scholes, and Iams Homes, infringed Karlson's copyright. Further, Karlson failed to meet his burden of proving entitlement to statutory damages, a precursor to enhancement of those damages for willful infringement.

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1) Plaintiff's Motion for Summary Judgment (Dkt.20) is **DENIED**.

2) The parties are directed to contact the Court's ADR coordinator, Susie Boring-Headlee, at (208) 334- 9067 if the parties still desire to schedule a settlement conference.

3) The Court will conduct a telephonic status conference with the parties on August 12, 2014, at 9:30 a.m. Counsel for Plaintiff shall initiate the call. The Court may be reached at (208) 334-9945.

Dated: **March 14, 2014**

Honorable Candy W. Dale
United States Magistrate Judge